IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DOUGLAS LAPHAM and <br> HILARIE LAPHAM, | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | )    Case No. 14-CV-02084-JAR <br> ) |
| WATTS REGULATOR COMPANY, | ) <br> ) |
| Defendant. | ) <br> ) |

## MEMORANDUM AND ORDER

Plaintiffs Douglas and Hilarie Lapham bring this action against Defendant Watts Regulator Company seeking damages for an allegedly defective toilet connector that Plaintiffs purchased from Defendant. Plaintiffs bring product liability claims premised on theories of design defect, manufacturing defect, and warning defect.[1] This matter comes before the Court on Defendant's Motion to Exclude Plaintiffs' Expert (Doc. 48) and Defendant's Motion for Summary Judgment (Doc. 50). The Court heard testimony from Plaintiffs' expert, Dr. Javier Cruz, and oral argument from the parties on both motions on January 5, 2016. The motions are fully briefed and the Court is prepared to rule. For the reasons explained in detail below, the Court denies Defendant's motion to exclude Plaintiffs' expert and denies Defendant's motion for summary judgment.

---

[1] Plaintiffs assert claims of strict liability and negligence in their Complaint based on design defect, manufacturing defect, and warning defect theories. The Kansas Product Liability Act ("KPLA") merges all claims based on product liability theories into a single "product liability" claim. K.S.A. § 60-3302(c); *McCroy v. Coastal Mart, Inc.*, 207 F. Supp. 2d 1265, 1270 (D. Kan. 2002). Therefore, the Court construes Plaintiffs' action as asserting product liability claims based on three theories of defect.

**I.      Background**

    **A.      Uncontroverted Facts**

Plaintiffs are husband and wife who moved into their home in Overland Park, Kansas, in July 2002. Within a year after purchasing the home, Plaintiffs installed a toilet connector that Defendant Watts manufactured. The connector consists of a hose that brings water from a supply line in a house to a toilet, and two coupling nuts at each end of the hose. The nut that connects to the supply line is metal, and the nut that connects to the toilet is plastic.[2] On July 20, 2012, the plastic coupling nut attaching the connector to the toilet fractured, causing severe water damage to Plaintiffs' home.

    **B.      Expert Analysis of Coupling Nut**

Plaintiffs hired Dr. Javier Cruz to determine the root cause of why the connector failed in Plaintiffs' home. Dr. Cruz is an engineer with experience in the behavior of polymeric materials. To perform his analysis, Dr. Cruz first conducted non-destructive testing on the coupling nut. Dr. Cruz began by examining all aspects of the coupling nut to generate and rule out theories about the cause of failure. He then visually examined the coupling nut using a high-magnification microscope to view the fracture surface.[3] Dr. Cruz partially pulled the coupling nut apart at the fracture point, but did not separate it to prevent spoliation of evidence. Because the coupling nut had only a partial crack that did not completely expose the fracture surface, and because Dr. Cruz chose not to completely pull the coupling nut apart, he could not clearly examine the thread design of the nut at the fracture surface.[4] However, Dr. Cruz could see the geometry of the coupling nut threads, which provided an indication of the thread design. Dr.

---

[2]The plastic nut attaches to the plastic fill valve of the toilet. Having a plastic-on-plastic connection at the toilet end avoids damage to the plastic fill valve in the event of cross-threading. Doc. 49 at 2.

[3]Doc. 49, Ex. B at 4–5.

[4]*Id.*

2

Cruz used another testing technique, fractography, to gain information about the features of the fracture surface on the coupling nut. Dr. Cruz learned that the fracture started near the bottom of the coupling nut and also learned where the thread root terminated.

After conducting the non-destructive examination, Dr. Cruz prepared a report describing his findings. Dr. Cruz ruled out several theories of the primary cause of failure, including improper installation, chemical attack, and severe aging.[5] He also opined that based on his visual examination and experience with 'AB' marked coupling nuts that are geometrically equivalent to the coupling nut at issue, the coupling nuts were defectively designed with a V-shaped thread with a sharp thread root. According to Dr. Cruz, this V-shaped design combined with stresses from tightening create "creep and slow crack growth over time" at the final thread root of the nut.[6] This, in turn, caused premature failure of the connector. Dr. Cruz also observed manufacturing defects on the surface of the coupling nut in the form of flow hesitations at the injection molding gate. Dr. Cruz asserted that these flow hesitations were the product of "less than optimal manufacturing conditions," and that the stresses caused by the flow hesitations "add[ed] to the overall part stresses contributing to part failure."[7]

Included in Dr. Cruz's report is a three-page section labeled "Design Analysis," which includes schematics of coupling nut designs with sharp threads. This section was prepared by engineers at The Madison Group ("TMG")—the engineering firm Dr. Cruz is employed at—to generally describe the features of sharp thread coupling nut designs and the stresses they are exposed to.

---

[5]Doc. 49, Ex. B at 6, 8.

[6]*Id.* at 6.

[7]*Id.* at 9.

On June 9, 2014, Dr. Cruz engaged in joint destructive testing with Defendant's expert, Dr. Michael Hayes. The parties conducted this testing by completely separating the coupling nut and visually examining the threads of the nut.[8] Completely separating the coupling nut allowed the parties to view the thread design more clearly. Dr. Cruz maintains that this examination confirmed his opinion that the coupling nut threads had a sharp design, which was the primary cause of creep rupture and failure.

Dr. Hayes prepared a report after the joint examination, and concluded that the coupling nut had a unified thread design that was not defective. Dr. Hayes also concluded that creep rupture caused the coupling nut to fail, but that the creep rupture was caused by something other than the design of the threads, such as a leak from Plaintiffs' improper re-installation of the connector.[9] Defendant also enlisted Jeya Padmanaban as an expert to perform a statistical analysis concerning the failure rate of Watts' connectors. Ms. Padmanaban analyzed claims submitted to Watts along with toilet connector sales data, and concluded that the connectors had a failure rate of 0.006%.[10]

## II.  Motion to Exclude Dr. Cruz

### A.  Standard

The Court has broad discretion in deciding whether to admit expert testimony.[11] Fed. R. Evid. 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[8] Doc. 49 at 4.

[9] Doc. 52, Ex. D at 7, 35–36.

[10] Doc. 49, Ex. I at 3–4, 8.

[11] *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).

> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.[12]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[13] In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis. "[A] district court must [first] determine if the expert's proffered testimony . . . has a 'reliable basis in the knowledge and experience of his discipline.'"[14] To determine reliability, the Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid."[15] Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[16] An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[17] It is not necessary to prove that the expert is "indisputably correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[18]

---

[12] Fed. R. Evid. 702.

[13] *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[14] *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[15] *BG Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 703 (10th Cir. 2012).

[16] *Id.* (quoting *Daubert*, 509 U.S. at 597).

[17] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[18] *Id.*

B.   Discussion

1)   Dr. Cruz's Qualifications

As a preliminary matter, the Court must determine whether Dr. Cruz is qualified to testify as an expert regarding the failure of the coupling nut in this case.[19] To be qualified to render an expert opinion under Rule 702, an expert must possess "such skill, experience, or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."[20] Defendant does not directly challenge Dr. Cruz's qualifications to testify as an expert. Dr. Cruz's curriculum vitae and his testimony at the *Daubert* hearing demonstrate that he has received a doctorate degree in engineering with a research focus on the behavior of plastics, has worked as an engineer in the plastics industry for more than ten years, has presented on topics related to failure of plastic parts, and has published articles on performing failure analyses on coupling nuts.[21] The Court finds that Dr. Cruz's background provides him with "such skill, experience or knowledge" to qualify him as an expert in this case.[22]

2)   Reliability

Defendant argues that Dr. Cruz's opinion is unreliable because it is not based on sufficient facts or data and is not the product of reliable methods. Defendant challenges the sufficiency of Dr. Cruz's opinion on several bases. First, Defendant contends that Dr. Cruz did not engage in any testing, because the non-destructive visual examination was not testing.

---

[19] *See* Fed. R. Evid. 702.

[20] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (citing *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1408 (10th Cir. 1990)).

[21] Doc. 52, Ex. C.

[22] Fed. R. Evid. 702; *LifeWise*, 374 F.3d at 928.

Second, Defendant argues that Dr. Cruz cannot rely on the joint testing he conducted with Dr. Hayes, because this examination was not included in his report or in a supplemental report, as required by Fed. R. Civ. P. 26(a)(2)(B)(i).[23] Finally, Defendant argues that Dr. Cruz's opinion is unreliable because the "Design Analysis" section of his report was created by another engineer and the schematics in that section do not represent the actual design of the connector in this case. Plaintiffs respond that Dr. Cruz supported his opinion with sufficient facts and data based on the non-destructive examination he performed on the connector nut. Further, Plaintiffs argue that Dr. Cruz was not required to supplement his report after destructive testing, because this testing only confirmed the opinion he established through his first examination. Finally, Plaintiffs contend that the schematics in the "Design Analysis" section were meant to generally describe the features of the connector nut in this case, and therefore including this section in his report was appropriate.

The Court finds that Dr. Cruz's initial non-destructive examination provided a scientifically valid basis for his opinion. Through micrography and fractography, Dr. Cruz was able to discern the geometry of the connector nut threads, which provided an indication as to the thread design. By examining the fracture surface, Dr. Cruz identified the starting point of the fracture at the bottom of the nut and determined that the fracture was caused by creep rupture. Based on this information and his experience conducting failure analyses on similar connector nuts, Dr. Cruz formed his opinion that the connector nut failed because of creep rupture caused by the sharp V-shaped design of the threads.[24]

---

[23] Fed. R. Civ. P. 26(a)(2)(B)(i) provides that an expert's report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(E) requires experts to supplement their reports "when required under Rule 26(e)."

[24] Doc. 49, Ex. B at 5–6.

Defendant argues that because Dr. Cruz admitted in his report that he could not "clearly examine[]" the thread design during the non-destructive examination, this testing does not provide a sufficient factual basis for his opinion.  As Dr. Cruz testified at the *Daubert* hearing, although he could not clearly see the thread design during this testing phase, he could determine the thread geometry and other features of the fracture, which gave him a good indication of the thread design and causes of failure.  This information was sufficient to provide a scientifically valid basis for Dr. Cruz's opinion.  Although Dr. Cruz may not have been able to determine the thread design with absolute certainty, "absolute certainty is not required."[25]  It is enough that he had a sufficient factual basis to support "a reasonably accurate conclusion as opposed to conjecture or speculation."[26]

Further, the Court finds that Dr. Cruz may testify concerning the joint destructive testing.  Defendant argues that this testing provided an additional basis for Dr. Cruz's opinion, and therefore Dr. Cruz was required to supplement his original report pursuant to Rule 26(a)(2)(B)(i).  However, Dr. Cruz's report and his testimony at the *Daubert* hearing reveal that he established his opinion based on information he gained during the non-destructive testing.  This initial testing provided a scientifically valid basis for Dr. Cruz's opinion.  Rather than gaining a new basis for his opinions, Dr. Cruz simply confirmed the opinions in his original report during the destructive testing.  In any event, Rule 26(e) requires supplementation when "the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties

---

[25] *Dodge*, 328 F.3d at 1222.

[26] *Id.*

during the discovery process or in writing."[27]  Defendant stated at the *Daubert* hearing that it knew during the discovery process of the destructive testing involving Dr. Cruz and Dr. Hayes. A supplemental report under Rule 26(e) was not necessary to make Defendant aware of this testing.  Accordingly, Dr. Cruz may testify concerning the destructive testing notwithstanding the lack of a supplemental report.

Finally, the Court is not convinced that the inclusion of the "Design Analysis" section in Dr. Cruz's report makes his opinion unreliable.  As Dr. Cruz testified, he included this section to help generally explain the features of connector nuts to non-engineers.  Although this section was not the original work of Dr. Cruz, it was not designed to be the basis for his opinion.  Dr. Cruz included a separate section in his report describing his visual examination and the features of the particular connector nut in this case.[28]  Therefore, the Court finds that Dr. Cruz had a scientifically valid basis to support his opinion.

Defendant also argues that Dr. Cruz's opinion is not the product of reliable principles and methods.  Specifically, Defendant contends that Dr. Cruz should have employed various methods beyond visual inspection that Dr. Hayes used, including studying engineering drawings for Watts' connectors; obtaining samples of the plastic used to make Watts' connectors; conducting tests with other engineers; consulting with scientists to analyze installation forces on Watts' connectors; and learning the expected life of Watts' connectors.[29]  The Court finds that these methods were not necessary to form the basis of a scientifically valid opinion.  Here, Dr. Cruz relied on a detailed visual examination of the connector nut to form his opinion.  Through the use of micrography and fractography, Dr. Cruz was able to determine the features of the coupling nut

---

[27]Fed. R. Civ. P. 26(e)(1)(A).

[28]Doc. 49, Ex. B at 5–11.

[29]Doc. 54 at 7–9.

and gain the information necessary to form his opinion regarding the failure of the nut. Any additional differences in his and Dr. Hayes' methodologies go to the weight of Dr. Cruz's opinion, rather than its admissibility.[30]

### 3) Relevance

The Court next addresses whether Dr. Cruz's opinion is helpful to the trier of fact pursuant to Rule 702. Helpfulness to the trier of fact is the "touchstone" of expert admissibility.[31] An expert's opinion must be "sufficiently tied to the facts of the case" to be helpful to the trier of fact.[32] "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."[33]

Defendant argues that because Dr. Cruz's opinion is not tied to the facts in this case, it would not be helpful to the trier of fact. Specifically, Defendant asserts that before forming his opinion in this case, Dr. Cruz did not consult with Plaintiffs to learn about the maintenance history of the connector; look at design drawings for the type of connector Plaintiffs owned; quantify the stress forces he claimed to have caused the fracture; or determine the grade of plastic used to make the connector nut.[34] Instead, Dr. Cruz based his opinions on a limited visual examination of the connector nut and the schematics in the Design Analysis. Therefore, Defendant argues, his opinion is not relevant to this particular connector nut.

---

[30]*See Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1442 (10th Cir. 1992) ("Admissibility of experimental evidence does not depend on identical actual and experimental conditions. Typically, dissimilarities go to the weight of the evidence rather than its admissibility.").

[31]*Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991) (citing *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1139 (3d Cir. 1983)).

[32]*United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quoting *Daubert*, 509 U.S. at 591).

[33]*United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014) (quoting *Daubert*, 509 U.S. at 591).

[34]Doc. 49 at 15–18.

Contrary to Defendant's arguments, the Court finds that Dr. Cruz's opinion is relevant. Dr. Cruz prepared his report after visually examining the connector nut at issue using micrography and fractography. Dr. Cruz's opinion was tied to the information he gained during this examination, and was confirmed during the destructive testing he performed with Dr. Hayes. The information Defendant identifies affects only the credibility of Dr. Cruz's testimony, not its admissibility. Because the Court finds that Dr. Cruz's opinion is both reliable and relevant to the case at hand, the Court denies Defendant's motion to exclude Plaintiffs' expert.

**III.    Summary Judgment Motion**

    **A.    Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[35] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[36] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[37] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[38]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[39] In attempting to meet this standard, a movant who

---

[35] Fed. R. Civ. P. 56(a).

[36] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[37] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[38] *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[39] *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[40]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[41] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[42] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[43] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[44] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[45] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[46]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of

---

[40]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

[41]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[42]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[43]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[44]*Adams*, 233 F.3d at 1246.

[45]Fed. R. Civ. P. 56(c)(4).

[46]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

every action."[47] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[48]

### B. Discussion

#### 1) Design Defect

To prevail on a product liability claim under the KPLA, Plaintiffs must demonstrate that: (1) their injury resulted from a condition of the product; (2) the condition was unreasonably dangerous; and (3) the condition existed at the time the product left defendant's control.[49] To establish the existence of a design defect, Plaintiffs must show that at the time it was sold, "the product, although perfectly manufactured, contain[ed] a defect that ma[de] it unsafe."[50] Defendant moves for summary judgment on the basis that Plaintiffs have not provided evidence of a design defect. Defendant argues that Plaintiffs' only evidence of a design defect comes from Dr. Cruz's opinion, and that Dr. Cruz is not qualified to testify under Rule 702. However, the Court has found, *supra*, that Dr. Cruz's expert opinion is admissible.

Where the parties present the "classic battle of the experts" at the summary judgment stage, it is up to a jury to evaluate what weight and credibility each expert opinion deserves.[51] Dr. Cruz opines in his report that the primary cause of failure was the V-shaped, sharp design of

---

[47]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[48]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[49]*Kernke v. Menninger Clinic, Inc.*, 173 F. Supp. 2d 1117, 1122 (D. Kan. 2001).

[50]*McCroy v. Coastal Mart, Inc.*, 207 F. Supp. 2d 1265, 1271 (D. Kan. 2002) (quoting *Jenkins v. Amchem Prods., Inc.*, 886 P.2d 869, 886 (Kan. 1994)).

[51]*Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty., Kan.*, 492 F.3d 1164, 1188 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 1762 (2008); *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) ("competing expert opinions present the 'classic battle of the experts' and it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves").

the coupling nut threads, which increased the stress concentration placed on the nut. According to Dr. Cruz, this sharp design does not conform to "[b]est design practices for plastic parts."[52] By contrast, Dr. Hayes opines in his report that the connector nut incorporates a unified thread design, which conforms to "good engineering practice."[53] Further, Dr. Hayes asserts that the true cause of failure was creep rupture caused by a leak that began when Plaintiffs improperly re-installed the connector nut. Here, the conflicting opinions of Dr. Cruz and Dr. Hayes concerning the design of the connector nut threads and the causes of failure create genuine issues of material fact concerning the existence of a design defect. It is for a jury to determine the credibility of the experts regarding their opinions on these issues of fact.

Defendant offers the statistical report of Jeya Padmanaban, who reviewed sales data and property damage claims submitted to Watts to determine a failure rate for Watts' connectors.[54] According to Ms. Padmanaban, the failure rate for Watts' connectors is 0.006%. Defendant also points to deposition testimony of Dr. Cruz, in which he agreed that if a design defect existed, every connector made with the defective design could be expected to fail. Defendant asserts that the 0.006% failure rate, coupled with Dr. Cruz's concession that a design defect would cause every connector nut to fail, negates any genuine issue of fact concerning the existence of a design flaw. Plaintiff responds that because Ms. Padmanaban relied on claims submitted to Watts to conduct her analysis, the 0.006% rate reflects only the rate of failure claims submitted, rather than the rate of actual product failure.

The Court finds that Ms. Padmanaban's findings do not negate the issues of fact concerning design defect in this case. As stated above, the conflicting opinions of Dr. Cruz and

---

[52]Doc. 49, Ex. B at 5.

[53]Doc. 49, Ex. G at 6.

[54]Doc. 49, Ex. I.

Dr. Hayes create genuine issues of material fact concerning the design of the connector nut threads.  Although the failure rate may add weight to Defendant's theory of failure, it does not resolve the overriding factual questions regarding the design and cause of failure of the particular connector nut in this case.  The Court also finds that Ms. Padmanaban's reliance on claims submitted to Watts to generate a failure rate creates open questions of fact as to whether the 0.006% figure reflects the actual failure rate for the connector nut at issue.  Further, Dr. Cruz's testimony that a defective design would likely cause all connectors to fail does not resolve the existing issue of material fact concerning the design of the connector.  By presenting evidence of Dr. Cruz's opinion regarding the defective design of the coupling nut threads, Plaintiffs have satisfied their burden at the summary judgment stage.

Defendant also argues that even if Plaintiffs can establish a design defect, they cannot establish that the defect is unreasonably dangerous because Plaintiffs did not suffer any physical injuries.  Under Kansas law, however, a showing of physical injury is not a prerequisite to establishing that a product is unreasonably dangerous.  A product may be unreasonably dangerous if it poses a danger to property other than the product itself.[55]  Ultimately, the test for whether a product is unreasonably dangerous is whether it "is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'"[56]  This inquiry is a question of fact to be determined by the factfinder.[57]  Here, Plaintiffs have presented evidence that the

---

[55]*See Elite Prof'ls, Inc. v. Carrier Corp.*, 827 P.2d 1195, 1201–02 (Kan. Ct. App. 1992) (holding that plaintiff could satisfy burden of establishing "unreasonably dangerous" element by proving that product "was unreasonably dangerous to property"); *see also* K.S.A. § 60-3302(d) (defining "harm" under KPLA as including "[d]amage to property").

[56]*Delaney v. Deere & Co.*, 999 P.2d 930, 944 (Kan. 2000) (quoting Restatement (Second) of Torts § 402A cmt. i (1965)).

[57]*Elite Prof'ls*, 827 P.2d at 1202.

defective design of the connector nut caused damage to Plaintiffs' property. From this evidence, a jury could reasonably find that the connector was unreasonably dangerous to Plaintiffs' property. Therefore, the Court denies summary judgment on Plaintiffs' design defect claim.

### 2) Manufacturing Defect

To establish a claim of manufacturing defect under Kansas law, Plaintiffs must show that a flaw was present in the product at the time it was sold and that the defective condition caused the claimed injury.[58] Defendant argues that summary judgment is proper because Plaintiffs have failed to show that the flow hesitations identified in Dr. Cruz's report caused the connector nut to fail. Defendant points to deposition testimony of Dr. Cruz, in which he states that his "report does not say at all that those flow marks caused the failure."[59] Plaintiffs respond that Dr. Cruz's report identifies the flow marks as contributing to the failure.

Kansas law recognizes that there may be more than one cause of injury, or concurrent causes.[60] Causes are concurrent when they are operative at the moment of injury and act together to cause the injury.[61] Here, Dr. Cruz's report states that the stresses caused by the flow marks "add[ed] to the overall part stresses contributing to part failure."[62] This is consistent with Dr. Cruz's testimony at the *Daubert* hearing that the additive stresses from installation, the design defect, and the manufacturing defect combined to cause failure. Thus, Plaintiffs have presented evidence that a manufacturing defect was a concurrent cause of failure.

---

[58]*Savina v. Sterling Drug, Inc.*, 795 P.2d 915, 923 (Kan. 1990); *Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1227 (D. Kan. 2002) (citing *Wilcheck v. Doonan Truck & Equip., Inc.*, 552 P.2s 938, 942 (Kan. 1976)).

[59]Doc. 51 at 9.

[60]*Puckett v. Mt. Carmel Reg'l Med. Ctr.*, 228 P.3d 1048, 1064–65 (Kan. 2010); *Cox v. Lesko*, 953 P.2d 1033, 1042 (Kan. 1998).

[61]*Puckett*, 228 P.3d at 1064–65.

[62]Doc. 49, Ex. B at 9.

Further, the Court finds that Defendant's reference to Dr. Cruz's deposition does not eliminate genuine issues of fact as to whether the manufacturing defect was a concurrent cause of failure. While Dr. Cruz conceded that his report did not identify the flow marks as the cause of failure, he simultaneously testified that the flow marks may have contributed to failure.[63] This testimony and the opinions in Dr. Cruz's report create open questions of fact regarding the operation of the flow marks as a concurrent cause of failure. These open questions of fact cannot be resolved at the summary judgment stage. Accordingly, the Court denies summary judgment on Plaintiffs' manufacturing defect claim.

### 3) Warning Defect

To prove the existence of a warning defect, Plaintiffs must show that Defendant failed "to adequately warn of a risk or hazard related to the way the product was designed," and that this failure caused the injury.[64] Defendant argues that Plaintiffs have not shown either the existence of a warning defect or that such defect caused the injury. Defendant refers to the deposition of Mr. Lapham, in which he states that he could not recall whether he had seen or read instructions on a hang flag attached to the connector.[65] Defendant contends that this demonstrates that Plaintiffs cannot show whether they failed to follow instructions on the hang tag or whether such instructions did not exist. Further, Defendant argues that Plaintiffs cannot establish causation, because they do not contend that the lack of instructions caused them to improperly install or use the connector.

---

[63] Doc. 49, Ex. C at 115:3–9 ("Essentially, my report does not say at all that those flow marks caused the failure. In fact, my report says that when you have flow marks, that is an indication that that part can have higher molded-in stresses which can contribute to failure, so that is my link.").

[64] *McCroy*, 207 F. Supp. 2d at 1271; *Jenkins*, 886 P.2d at 887.

[65] Doc. 51 at 12.

17

Plaintiffs respond that Mr. Lapham's testimony establishes that there were no instructions associated with the connector, except for instructions that were embossed on the connector that stated "HAND TIGHT ONLY."  Plaintiffs also claim that Defendant's response to their request for production of all instructions associated with the connector referred only to the "HAND TIGHT ONLY" instruction.[66]  Additionally, Plaintiffs contend that because Defendant maintains that the cause of failure was Plaintiffs' re-installation of the connector, issues of fact remain as to the adequacy of the "HAND TIGHT ONLY" instruction.  Plaintiffs argue that with a more adequate instruction, they could have avoided the problems that Defendant contends were caused by their re-installation of the connector.

The Court finds that genuine issues of material fact remain concerning the existence of adequate instructions associated with the connector nut.  Mr. Lapham's testimony that he does not recall any instructions beyond "HAND TIGHT ONLY" and Defendant's response to Plaintiffs' request for instructions related to the connector nut suggest that there were no instructions beyond the "HAND TIGHT ONLY" instruction.  This evidence is rebutted by Defendant's reference to Mr. Lapham's statement that there may have been a hang flag with some additional instructions.  These conflicting pieces of evidence create genuine issues of material fact concerning the existence and adequacy of the connector nut instructions.

Further, the Court finds that genuine issues of material fact remain as to whether the inadequacy of instructions caused the injury in this case.  Plaintiffs do not argue that the lack of instructions caused them to install or re-install the connector nut improperly.  On the contrary, Plaintiffs contend that there is no evidence that they installed the nut improperly.  However, Defendant's theory of failure, based on Dr. Hayes' opinion, is that Plaintiffs caused the failure by

---

[66]Doc. 53 at 7.

improperly re-installing the connector nut.[67]  Defendant's advancement of this theory of failure places in issue the question whether the adequacy of the instructions caused Plaintiffs to improperly re-install the nut.  Therefore, the Court finds that genuine issues of material fact remain regarding causation, and thus summary judgment must be denied on Plaintiffs' warning defect claim.

## IV.     Conclusion

The Court finds that Dr. Cruz's expert opinion is sufficiently reliable and relevant to the case at hand to justify admission of his testimony under Rule 702.  Accordingly, the Court denies Defendant's motion to exclude Plaintiffs' expert.  Further, the Court finds that genuine issues of material fact remain as to the existence of design, manufacturing, and warning defects in relation to the connector nut in this case, and whether such defects caused Plaintiffs' injury.  Therefore, the Court denies Defendant's motion for summary judgment on Plaintiffs' product liability claims.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Exclude Plaintiffs' expert (Doc. 48) is **denied.**

**IT IS FURTHER ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 50) is **denied.**

**IT IS SO ORDERED.**

Dated: January 21, 2016

                                             S/ Julie A. Robinson
                                             JULIE A. ROBINSON
                                             UNITED STATES DISTRICT JUDGE

---

[67] Doc. 47 at 4 ("Plaintiffs caused the nut to fail when they reinstalled it (at least once)"); Doc. 49, Ex. G at 5 (Opinion of Dr. Hayes that leakage observed on the connector nut "is consistent with an improper re-installation").